**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| FRED THOMPSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-3077 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 30, 31 |
| | : | | |
| HICAPS INCORPORATED, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Denying Defendants HICAPS and McGee's Motion for Summary Judgment;**
**Granting Defendants MSI and Silverfarb's Motion for Summary Judgment**

**I. INTRODUCTION**

A few years ago, Plaintiff Fred Thompson was fired from his job as a construction site supervisor.  Mr. Thompson was working on a project for Washington Metropolitan Area Transit Authority ("WMATA") when a serious safety violation occurred on his watch.  Mr. Thompson's employer, HICAPS Inc. ("HICAPS"), was a subcontractor to Motorola Solutions ("MSI"), the project's prime contractor.  According to Mr. Thompson, an African American male, he was fired because of his race.  He brings this three-count action for: (1) violation of the District of Columbia Human Rights Act ("DCHRA") by Defendants HICAPS, Wayne McGee (Vice President and co-owner of HICAPS), MSI, and Jake Silverfarb (Lead Program Manager of MSI); (2) tortious interference with employment contract/relationship by MSI and Mr. Silverfarb; and (3) violation of the Civil Rights Act of 1866, codified at 42 U.S.C. § 1987, by HICAPS and MSI.  For the reasons described below, the Court finds that there is a genuine dispute of material fact with respect to Mr. Thompson's race discrimination claims against HICAPS and Mr. McGee.  Therefore, the Court will deny their motion for summary judgment.  By contrast, the Court finds

that Mr. Thompson has not raised a genuine dispute of material fact in his race discrimination

and tort claims against MSI and Mr. Silverfarb.  Therefore, the Court will grant their motion for

summary judgment.

## II.  BACKGROUND

### A.  Factual Background

Mr. Thompson was employed by HICAPS from February 7, 2019 until his termination on

August 2, 2019.  *See* Ex. D to Defs.' HICAPS Inc. and Wayne McGee's Mot. Summ. J.

("HICAPS Mot."), ECF No. 30-6; Ex. M to HICAPS Mot., ECF No. 30-15.  HICAPS was a

subcontractor to MSI, the prime contractor on the "WMATA Project."  Def. HICAPS's

Statement of Undisputed Material Facts ("HICAPS Undisputed Facts") ¶¶ 1, 3, ECF No. 30-1.

The WMATA Project's purpose was to provide radio frequency communications network

solutions, and it spanned over two dozen work sites across the Washington, D.C. area.  Def.

MSI's Statement of Material Facts as to Which There Is No Genuine Dispute ("MSI Undisputed

Facts") ¶ 1, ECF No. 31-3.

In February 2019, HICAPS interviewed and hired Mr. Thompson for the position of

Quality Control Inspector (also known as Construction Inspector).  *Id.* ¶ 9.  Wayne McGee, the

Vice President and co-owner of HICAPS, was involved in the decision to hire Mr. Thompson.

*Id.* ¶¶ 6, 8.  During his time at HICAPS, Mr. Thompson was supervised by Lee Ragin,

HICAPS's Quality Manager, who knew him previously and who recommended him for this job.

Ragin Dep. 7:1–2, 10:3–19, 12:13–20.[1]  About two months into his job, HICAPS notified Mr.

Thompson that it needed to fill a vacancy for a Site Supervisor (also known as Construction

---

[1] No party appended the entirety of Ms. Ragin's deposition.  The same is true for the
other depositions submitted in these motions.  Scattered excerpts of deposition testimonies can
be found in attachments to both motions for summary judgment, both oppositions, and
Defendants HICAPS and McGee's reply.

Superintendent).  MSI Undisputed Facts ¶ 18.  Mr. Thompson subsequently filled the Site
Supervisor position in a temporary capacity while continuing to perform his duties as Quality
Control Inspector.  *Id.* ¶¶ 18, 24; HICAPS Undisputed Facts ¶ 10.  The Site Supervisor position
had more responsibilities compared to the Quality Control Inspector position, but the two jobs
shared significant overlap, and both job descriptions included the duty to ensure safety.  MSI
Undisputed Facts ¶ 19.  Mr. Thompson claims that he was qualified for both positions.  Pl.'s
Mem. Points and Authorities in Opp'n to Defs.' Mot. Summ. J. ("HICAPS Opp'n") at 10, ECF
No. 33.  While employed at HICAPS, Mr. Thompson acquired an OSHA 30 certificate, which
entailed basic OSHA safety training and an online test.  Thompson Dep. 20:13–21:12.[2]

In late July 2019, Mr. Thompson was the assigned Site Supervisor at the WMATA
Project's Dyson site located in Brandywine, Maryland.  MSI Undisputed Facts ¶¶ 25–26.  At that
time, part of the work being performed at the Dyson site was an excavation to place a concrete
box in the ground to provide footing for a propane tank.  *Id.* ¶ 28.  Several meetings occurred
prior to the excavation to discuss its details.  *Id.*; HICAPS Undisputed Facts ¶¶ 20–21.  On July
31, Mr. Thompson attended a meeting including Mr. Green, Mr. Semler, and others to discuss
the excavation.  HICAPS Opp'n at 4–5; Pl.'s Mem. Points and Authorities in Opp'n to Def.'s
Mot. Summ. J. ("MSI Opp'n") at 5, ECF No. 35; *see also* Smith Dep. 18:13–17 (preconstruction
meeting was held involving "several people from WMATA, HICAPS, and [subcontractor]
Project Concrete on site").  Following this meeting, excavation for the propane tank began.  A
daily report from WMATA dated July 31 describes the "[s]cope of work" as "excavating footing
for propane tank."  Ex. H to HICAPS Mot. at 1, ECF No. 30-10.

---

[2] "OSHA" stands for the Occupational Safety and Health Administration, a federal
agency whose mission is to ensure safe and healthy working conditions.  *See*
https://www.osha.gov/aboutosha (last visited September 19, 2022).

On August 1, several events occurred that form the center of this dispute.  Mr. Thompson signed in at the Dyson site that morning at 7:00 a.m.  Ex. K to HICAPS Mot. ("Aug 1. Timesheet") at 1, ECF No. 30-13; Thompson Dep. 68:4–5.  Between the hours of 7 a.m. and 11 a.m., at least two employees from subcontractor Project Concrete were working in the excavation.  Ex. J. to HICAPS Mot. ("C-23 Form") at 1, 4, ECF No. 30-12; Thompson Dep. 85:24–86:7.  The parties agree that Coke Smith, HICAPS's Construction Manager and one of Mr. Thompson's supervisors, was not present at the site.  HICAPS Undisputed Facts ¶¶ 32–34.[3]  But they dispute whether any other HICAPS employees were at the site between 7 and 11 a.m.  According to Defendants' timeline of events, at about 11 a.m., Tom Hardee, WMATA's Safety Manager, and James Semler, HICAPS's Safety Assistant Superintendent, both arrived at the site.  HICAPS Undisputed Facts ¶¶ 28–29; Def. Motorola Solutions, Inc.'s Mot. Summ. J. ("MSI Mot.") at 16, ECF No. 31-2; Semler Decl. ¶¶ 3–4, Ex. H to MSI Mot., ECF No. 31-12.  Mr. Hardee and Mr. Semler saw that the excavation was improperly shored and filled with water, and that two workers were inside the trench and "exposed to risk of serious injury or death."  MSI Undisputed Facts ¶ 36.  Mr. Thompson agrees that Mr. Hardee arrived at the site at about 11 a.m.  HICAPS Undisputed Facts ¶ 28.  Mr. Thompson claims, however, that Mr. Semler was already present at the site "early" in the morning and "[w]ay before" Mr. Hardee had arrived.  Thompson Dep. 67:6–68:18; HICAPS Opp'n at 5.[4]

---

[3] At one point in his deposition, Mr. Thompson claimed that Mr. Green was also present before Mr. Hardee's arrival.  Thompson Dep. 67:9–20.  But he later clarified that, as indicated by the timesheet, Mr. Green arrived at 11:15 a.m. *See id.* at 70:8–12 ("Jim [Green] signed in right when he got there [at 11:15 a.m.].").  Thus, the Court's analysis will focus on the dispute about Mr. Semler's arrival time.

[4] HICAPS argues that Mr. Thompson conceded that Mr. Semler arrived at the Dyson site at 11:00 a.m. or later.  Defs. HICAPS Inc. and Wayne McGee's Reply Mem. in Support of Their Mot. Summ. J. ("HICAPS Reply") at 4, ECF No. 36.  Indeed, Mr. Thompson's opposition to HICAPS's Statement of Undisputed Facts marks this fact as "[u]ndisputed." *Compare* HICAPS

All parties in this case agree that the situation at the Dyson site that morning constituted a "serious OSHA violation."  MSI Undisputed Facts ¶ 38; *see also* HICAPS Opp'n at 6 (workers in trench were exposed to "risk of serious injury or death"); Jones Dep. 29:18–30:2 (situation was "life-endangering").  According to Mr. Hardee's report documenting this incident, there was "[b]ad excavation," "eight ft verticle walls [sic], no [l]adder, no spoils 2 ft off slope, water filtering into trench, 2 employees exposed, [n]o shoring on-site."  MSI Undisputed Facts ¶¶ 40–41 (alterations in original); *see* Ex. J to HICAPS Mot. ("C-21 Report"), ECF No. 30-12.  Mr. Hardee's report indicates that this setup violated OSHA regulations which require additional safety measures when excavating beyond a depth of five feet.  MSI Undisputed Facts ¶ 43.  Upon seeing the excavation, Mr. Hardee immediately stopped work and sent the workers home.  *Id.* ¶¶ 38, 44.[5]  Mr. Hardee then sent a copy of the C-21 Report to Wes Jones, MSI's Program Director.  *Id.* ¶ 40.

---

Undisputed Facts ¶ 29, *with* Pl.'s Response to HICAPS Undisputed Facts ¶ 29, ECF No. 33-1.  Where, as here, a party "fail[s] to submit a statement of disputed facts or submit[s] a deficient statement" under Local Rule 7(h), the Court *may* deem these facts "admitted."  *Ingram v. District of Columbia*, No. 18-cv-1598, 2021 WL 3268379, at *1 (D.D.C. July 30, 2021), *aff'd sub nom. Ingram v. D.C. Child & Fam. Servs. Agency*, No. 21-7085, 2022 WL 1769140 (D.C. Cir. June 1, 2022).  The purpose of Rule 7(h) is to require "the parties and their counsel, who are most familiar with the litigation and the record, to crystalize for the district court the material facts and relevant portions of the record."  *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 65–66 (D.D.C. 2015) (quoting *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996)).

Despite counsel's mistake, the Court will not treat this fact as conceded.  As cited above, Mr. Thompson's opposition and testimony plainly dispute Defendants' timeline of the morning of August 1.  Given the importance of these events to the parties' dispute, the Court will not "penalize" Mr. Thompson for the "error[s] committed by h[is] counsel" but instead "undertake[] its own independent review of the record."  *Ingram*, 2021 WL 3268379, at *2.

[5] Mr. Semler's report, dated August 2, 2019, corroborates Mr. Hardee's observations.  *See* C-23 Form ("Two individuals working for Project Concrete were in the un-protected excavation. . . . [T]here was no means of egress present, no trench-boxes or excavation protection implemented, spoils were also not 2ft away from the edge per OSHA regulation. . . . One side of the excavation was properly sloped, another side had the [sic] uncovered an existing fuel tank (see attached pictures).").

Later that same day, WMATA's Project Manager Allen Wonder sent an email to Mr. Jones describing this incident in detail and attaching photos from the excavation site. Ex. 14 of Ex. A to MSI Mot. ("WMATA Email"), ECF No. 31-5. The email also announced a stop work on every work site across the entire WMATA Project. *Id.*; MSI Undisputed Facts ¶ 51. WMATA explained it was doing this as a result of having "recently observed multiple safety and quality infractions by subcontractors performing work under Motorola." WMATA Email. WMATA further imposed several new training, meeting, and certification requirements on MSI and all the subcontractors working on the WMATA Project before WMATA would permit work to resume. *Id.*

After reviewing the WMATA email, Mr. Jones called Mr. McGee. MSI Undisputed Facts ¶ 58; McGee Dep. 11:6–7. On the call, Mr. Jones asked Mr. McGee to identify "who was the Motorola [or] HICAPS representative on site," and Mr. McGee identified solely Mr. Thompson. Jones Dep. 17:11–22, 42:1–4. Mr. Jones then directed Mr. McGee to remove Mr. Thompson from the WMATA Project. HICAPS Undisputed Facts ¶ 39; Jones Dep. 14:12–18; McGee Dep. 10:21–11:2. Mr. McGee testified that he had also reviewed photographs from the Dyson site and was familiar with the facts of the incident, and he was "pretty certain" that he spoke to Mr. Smith, Mr. Green, and Mr. Semler that day as part of his own investigation. MSI Undisputed Facts ¶ 69; McGee Dep. 13:1–3, 22:7–19.

The next day, on August 2, Mr. McGee called Mr. Thompson to inform him that he was terminated from HICAPS. McGee Dep. 14:6–10; Thompson Dep. 100:14–101:4. At some point, Mr. Thompson called Mr. McGee back to ask why he was being terminated. McGee Dep. 16:5–17:3; Thompson Dep. 101:9–102:3. Mr. McGee explained that his termination was due to the incident at the Dyson site and the fact that HICAPS had no other work available for him

outside the WMATA Project.  HICAPS Undisputed Facts ¶ 42; MSI Undisputed Facts ¶ 70; McGee Dep. 17:2–15.

On August 16, 2019, HICAPS sent Mr. Thompson a termination letter which informed him that he was terminated as of August 2.  *See* Ex. M to HICAPS Mot.  No other employee of MSI or HICAPS faced any personal discipline as a result of the incident at the Dyson site.  *See* Green Dep. 23:21–24:1; Jones Dep. 50:20–51:1; McGee Dep. 28:20–29:1, 33:11–19; 34:19–22; Ragin Dep. 38:21–39:12; Smith Dep. 35:11–14, 41:19–42:7.  At some point after Mr. Thompson's termination, Ms. Ragin and Mr. Green attended a conference together where Ms. Ragin privately asked Mr. Green about Mr. Thompson's termination.  Ms. Ragin testified that Mr. Green told her "it was fucked up what they did to Fred."  Ragin Dep. 14:18–15:22.  Mr. Thompson also testified that Ms. Ragin told him that MSI and HICAPS "used [him] as a scapegoat."  Thompson Dep. 135:1–10.

## B.  Procedural History

Mr. Thompson filed suit against HICAPS, Mr. McGee, MSI, and Mr. Silverfarb in D.C. Superior Court on August 3, 2020.  Notice of Removal ¶ 1, ECF No. 1.  Mr. Thompson asserted claims of race discrimination against all Defendants under the DCHRA, D.C. CODE § 2-1402.11(a), and race discrimination against Defendants HICAPS and MSI under the Civil Rights Act of 1866, 42 U.S.C. § 1981.  He also asserted a claim of tortious interference with employment contract/relationship under D.C. law against MSI and Mr. Silverfarb.[6]  *See* Compl. ¶¶ 19–21, ECF No. 1-1.  Mr. Thompson sought declaratory and injunctive relief as well as compensatory and punitive damages.  *Id.* at 9.  Defendants timely removed the action to this

---

[6] The Court has federal-question jurisdiction over Mr. Thompson's section 1981 claims. 28 U.S.C. § 1331.  It has supplemental jurisdiction over his DCHRA claims and his D.C. tort claims.  *See* 28 U.S.C. § 1367(a); *Moini v. LeBlanc*, 456 F. Supp. 3d 34, 40 n.2 (D.D.C. 2020).

Court pursuant to 28 U.S.C. § 1441(a).  All Defendants now move for summary judgment.  ECF

Nos. 30, 31.  The motions are ripe for decision.

### III.  LEGAL STANDARD

Summary judgment is appropriate where the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  This standard serves to streamline litigation by disposing of factually

unsupported claims or defenses and determining whether there is a genuine need for trial.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of

identifying portions of the record that demonstrate the absence of any genuine issue of material

fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  If the moving party meets this

burden, then the non-movant must point to specific facts in the record that reveal a genuine issue

that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  A "material" fact is one capable of

affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to

return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The non-

movant must provide evidence that would permit a reasonable jury to find in his or her favor. *See*

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  When evaluating whether a

genuine dispute of fact exists, a court must refrain from making credibility determinations or

weighing the evidence; rather, "[t]he evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255; *see also*

*Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  The Court must credit the "plaintiff's

uncorroborated version of events" unless contrary evidence "'quite clearly' demonstrates the

falsity of the plaintiff's statement."  *Robinson v. Pezzat*, 818 F.3d 1, 9–10 (D.C. Cir. 2016); *see*

*also Jackson v. Starbucks Corp.*, No. 19-cv-1487, 2022 WL 888180, at *8 (D.D.C. Mar. 25, 2022) (observing that it is a "rare case[]" when "a plaintiff's testimony is so undermined by other evidence in the record that the Court can set it aside at the summary judgment stage").

## IV.  ANALYSIS

Mr. Thompson's claims can be grouped into three categories.  First, he claims race discrimination against Defendants HICAPS (DCHRA and § 1981) and McGee (DCHRA).  Second, he claims race discrimination against Defendants MSI (DCHRA and § 1981) and Silverfarb (DCHRA).  Finally, he claims tortious interference with an employment contract/relationship against Defendants MSI and Silverfarb.  The Court will examine each in turn.

### A.  HICAPS, Wayne McGee (Race Discrimination)

"Section 1981, as amended by the Civil Rights Act of 1991, prohibits racial discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Morris v. Carter Goble Lee, Inc.*, 113 F. Supp. 3d 289, 293 (D.D.C. 2015) (quoting 42 U.S.C. § 1981(b)).  Likewise, under the DCHRA, it is unlawful, on the basis of race, to "fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual . . . or otherwise adversely affect his or her status as an employee."  D.C. CODE § 2-1402.11(a)(1)(A).

The starting point of this analysis is the Supreme Court's burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (holding that *McDonnell Douglas* framework applies to both DCHRA and section 1981 claims).  Under this framework,

> the plaintiff must first establish a prima facie case of discrimination.  Once []he has done that, the burden shifts to the defendant, who must articulate some legitimate,

nondiscriminatory reason for the adverse action.  If the defendant satisfies that burden, the *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and the sole remaining issue is discrimination *vel non*.  Thereafter, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.

*Czekalski*, 475 F.3d at 363 (cleaned up).  Under the law of this Circuit, however, if "the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant'" and "is a largely unnecessary sideshow." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (citation omitted); *see Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).  In that situation, the Court should simply consider "all the evidence" "to decide whether the defendant intentionally discriminated against the plaintiff." *Brady*, 520 F.3d at 494 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983)).  "To answer that question at the summary judgment stage, the court assesses whether 'there is evidence from which a reasonable jury could find that the employer's stated reason for the firing is pretext.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (quoting *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)).  In addition, "evidence suggesting that the employer treated similarly situated persons who were not the same race as the plaintiff more favorably than it treated the plaintiff can also be probative of discrimination." *Id.* at 296–97 (citation omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).[7]

---

[7] Although the *McDonnell Douglas* framework governs both the section 1981 and DCHRA claims in this case, these claims have a different standard of causation.  MSI Mot. at 6 n.2.  The Supreme Court has clarified that in a section 1981 suit, plaintiff must show "but for" causation.  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (rejecting "motivating factor" standard of causation).  The DCHRA, however, appears to

Here, Mr. Thompson has not offered any direct evidence of intentional discrimination, so the *McDonnell Douglas* framework applies.  But as soon will soon be clear, Defendants have offered non-discriminatory reasons for Mr. Thompson's termination, so the Court need not decide whether Mr. Thompson has presented a *prima facie* case of discrimination.  Instead, it will directly "skip ahead to the third step in the test" and consider all the evidence.  *Wheeler*, 812 F.3d at 1114.

HICAPS claims that it terminated Mr. Thompson "when he failed in his role as Site Supervisor leading to a project-wide shut down, [its] customer called for Plaintiff's removal from the contract, and [it] had no other work available for Plaintiff."  HICAPS Mot. at 14.  HICAPS emphasizes that the primary basis for Mr. Thompson's termination was not the decision to dig the trench or even how it was dug, but that he allowed workers to go inside the trench when it was unsafe.  *See id.* at 23 (Mr. Thompson "was the only HICAPS employee on site at the time the workers went into the improperly sloped trench"); McGee Dep. 17:19–18:2 ("Q. What is it that Mr. Thompson did or failed to do that warranted his termination?  A. He allowed workers into a dangerous position on a construction site without ample safety precautions that could have resulted in bodily harm or death."); Smith Dep. 36:12–17 ("[I]t wasn't that the trench was the issue.  It was, it was unshored and somebody was in the hole[.]"); Green Dep. 16:9–16 ("Mr. Hardy [sic] conveyed to me that he walked up on the excavation site and workers were down inside the bottom of the trench in an unsafe condition.").

---

impose a more lenient standard of causation.  *See Johnson v. District of Columbia*, 225 A.3d 1269, 1281 (D.C. 2020) (noting that plaintiff in DCHRA race discrimination case must prove that "race was the real motivating factor" (citation omitted)); *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 956 (D.C. 2012) ("In order to establish a *prima facie* case of discriminatory discharge under the Human Rights Act [plaintiff is] required to show that . . . a substantial factor for the termination was that she is a member of the protected class.").  Nothing in this Opinion turns on this distinction, but it may be important later on at trial.

In response, Mr. Thompson argues as the sole African American worker at the site, he was "used as a scapegoat" for the OSHA incident "by his Caucasian supervisors."  HICAPS Opp'n at 2.  Mr. Thompson makes numerous arguments in an attempt to show that the basis of his termination was pretextual.  For example, he claims that he did not receive proper training for a supervisory role that was forced upon him; that other HICAPS employees (not he) made the decision to excavate the trench; that he was immediately terminated without progressive discipline and an exit interview; and that three other similarly situated white employees received better treatment.  HICAPS Opp'n at 14–22.  Mr. Thompson's pretextual arguments largely miss the mark, but at the moment, the Court need not go through them one by one.  *See Primas v. District of Columbia*, 719 F.3d 693, 697 (D.C. Cir. 2013) (glossing over plaintiff's arguments for pretext and focusing on plaintiff's "best case").  The key factual question in this case is *whether Mr. Semler (or any other HICAPS employee with supervisory duties) was already present with Mr. Thompson at the Dyson site on the morning of August 1 when Mr. Hardee arrived.*  If so, a jury could reasonably draw the inference that Mr. Thompson was singled out to be fired while his white co-worker—who undisputedly also had a duty to ensure on-site safety—got off scot-free.  "[A]t its core," Mr. Thompson's case against HICAPS and Mr. McGee comes down to this factual dispute.  *Id.*

The Court finds that Mr. Thompson has presented a genuine issue of material fact on this question.  Mr. Thompson testified under oath that "way before" Mr. Hardee arrived at the Dyson site at 11:00 a.m., Mr. Semler was at the site with Mr. Thompson.  Thompson Dep. 67:9–19.  Mr. Thompson's testimony is contradicted by Mr. Semler, who submitted a declaration in which he recalled arriving at the Dyson site around 11:00 a.m. and walking with Mr. Hardee together to the site.  Semler Decl. ¶¶ 3–4.  If Mr. Semler was in fact present with Mr. Thompson before Mr.

Hardee arrived, then a jury might very well believe that racial discrimination was behind Mr. Thompson's termination.  It would appear odd, to say the least, that HICAPS immediately terminated the sole African-American supervisor at the Dyson site without even bothering to discipline the other, white supervisor (who was a *safety* supervisor, no less) also present during the life-endangering excavation.  Indeed, no one disputes that if Mr. Semler was present at the site, he had an obligation to ensure safe excavation.  *See* Ragin Dep. 37:9–19 (Mr. Semler "had responsibility for ensuring that there was shoring in place").  Nor does anyone dispute that if Mr. Semler was present that morning and failed to ensure safety, he should have faced some form of discipline.  *See* McGee Dep. 34:7–35:10 (Mr. Semler "very likely would have been disciplined" "had [he] been on site").[8]

Although Mr. Thompson's testimony on this fact is uncorroborated, the D.C. Circuit has instructed that "it is up to the jury, not the district court, to 'assess the validity of' plaintiff's uncorroborated version of events."  *Robinson*, 818 F.3d at 9 (citation omitted)).[9]  A jury could give weight to Mr. Thompson's testimony on this fact and therefore conclude based on all the evidence that HICAPS engaged in racial discrimination by terminating Mr. Thompson.  Of course, the jury might credit the opposing testimony.  But whether Mr. Semler (or any other HICAPS employee with supervisory duties) was present with Mr. Thompson at the Dyson site on the morning of August 1 is not for the Court to decide, for at the summary judgment stage, "a

---

[8] Although Mr. Semler occupied a different role than Mr. Thompson at HICAPS, they are sufficiently analogous comparators because of their similar "job duties" with respect to ensuring safety of the Dyson excavation site and "the similarity of their offenses"—that is, being present at the Dyson site while the OSHA violation occurred.  *Burley*, 801 F.3d at 301 (finding these factors relevant).

[9] While Ms. Ragin's testimony that Mr. Green believed Mr. Thompson's termination was "fucked up" is too general to corroborate Mr. Thompson's account of who was present at the Dyson site on the morning of August 1, it does support Mr. Thompson's side of the story.  *See* Ragin Dep. 14:18–15:22.

court must refrain from making credibility determinations or weighing the evidence." *Baker-Notter v. Freedom F., Inc.*, No. 18-cv-2499, 2022 WL 798382, at *4 (D.D.C. Mar. 15, 2022) (citing *Anderson*, 477 U.S. at 255). "The point . . . is that this case hinges on the answer to a question that itself hinges on credibility determinations more appropriately made from a jury's box than a judge's bench." *Primas*, 719 F.3d at 698; *see also Wheeler*, 812 F.3d at 1116 (finding hospital employer not entitled to summary judgment because there was a genuine dispute of material fact regarding whether plaintiff nurse, who engaged in some misconduct, was treated the same as other nurses with records of misconduct who were not terminated).

HICAPS's arguments to the contrary are unpersuasive. First, this is not one of those "rare case" in which evidence "'quite clearly' demonstrates the falsity of the plaintiff's statement." *Jackson*, 2022 WL 888180, at *8 (citation omitted). HICAPS relies on a photo of an August 1 timesheet from the Dyson site to contradict Mr. Thompson's timeline of events, but the photo is inconclusive at best. *See* Aug 1. Timesheet. The photo cuts off the bottom left corner of the timesheet, partially obscuring the time entry from Mr. Semler—the key character in question. *Id.* Furthermore, the timesheet may be *consistent* with Mr. Thompson's testimony. Recall that Mr. Thompson testified that Mr. Semler "showed up early," Thompson Dep. 69:12–16, but that he did not sign in right away and that Mr. Thompson told him "to go back and sign it," *id.* at 67:9–17; *see also id.* at 70:23–24 ("guys sometimes walk in and they'll forget to sign in"). This instruction from Mr. Thompson would be consistent with his duties as Site Supervisor to "ma[k]e sure that everyone signed in, signed out." *Id.* at 48:10–12; *see also id.* at 67:1–5 ( "I'm the person who maintained" the August 1, 2019 Dyson site sign-in sheet); Green Dep. 13:6–12 ("As required on every site of the project, you signed in when you arrived on site. The site supervisor was to approach you if he noticed that you had come on the site for the first time, and

he would ask you to sign in the log book.").  Mr. Thompson recalled that on August 1, he left the timesheet unattended on his truck because on that particular day he was already "over in the site."  Thompson Dep. 70:21–22.  Thus, the timesheet photo does not necessarily contradict or undermine Mr. Thompson's statements.  The significance of this photo and the underlying timesheet are factual questions that are to be resolved by a jury.

Second, HICAPS insists that because Mr. McGee hired Mr. Thompson and then fired him in a short time period, HICAPS should be accorded an inference against racial discrimination.  Under the so-called "same-actor" inference, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire, especially when the firing has occurred only a short time after the hiring."  *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (cleaned up) (alteration in original).  Here, there is some dispute about the level of Mr. McGee's involvement in HICAPS's decision to hire Mr. Thompson.  *Compare* HICAPS Undisputed Facts ¶ 6, *with* Pl.'s Response to HICAPS Undisputed Facts ¶ 6.  In any event, the D.C. Circuit has made clear that this inference alone is not "sufficient to keep [a] case from the jury," and the fact that an employer "once" hired someone "cannot immunize him from liability for subsequent discrimination."  *Czekalski*, 475 F.3d at 369; *see also Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 38 n.29 (D.D.C. 2008) ("[T]he same actor inference is just that, an inference[.]" (citation omitted)).  This inference cannot on its own eliminate the genuine dispute of material fact in this case.  Therefore, summary judgment for Defendant HICAPS is improper.

Summary judgment for Defendant McGee is also improper for all of the reasons described above.  Mr. McGee claims that he alone made the decision to terminate Mr. Thompson.  McGee Dep. 9:12–19.  Given the unresolved factual disputes in this case, it is

possible that Mr. McGee may be personally liable for Mr. Thompson's termination.  *See Brown v. Children's Nat. Med. Ctr.*, 773 F. Supp. 2d 125, 136 (D.D.C. 2011) ("An individual . . . may be held liable personally under the DCHRA if []he is acting on behalf of an employer.").  Therefore, the Court will deny HICAPS and Mr. McGee's motion for summary judgment.

### B.  MSI and Jake Silverfarb (Race Discrimination)

Mr. Thompson also raises racial discrimination claims against MSI and Mr. Silverfarb.  But these claims cannot withstand summary judgment.  For starters, Thompson's own testimony contradicts his claims.  At his deposition, in response to a question by MSI's counsel to identify who at MSI discriminated against him, Mr. Thompson replied, "At Motorola?  No.  At Motorola, basically, it was more so an interference situation."  Thompson Dep. 137:20–23.  MSI's counsel then sought to confirm Mr. Thompson's response: "So is it your testimony that no one at Motorola discriminated again[st] you?"  *Id.* at 137:24–25.  Mr. Thompson replied, "Yeah.  No one at Motorola discriminated again[st] me."  *Id.* at 138:1–2.  This testimony is damaging because it goes to the heart of Mr. Thompson's racial discrimination claims against MSI and Mr. Silverfarb.  It would be one thing if Mr. Thompson claimed discrimination but had trouble identifying who precisely at MSI discriminated against him—that might be understandable, because victims of discrimination may not always be able to pinpoint a single actor within an entire organization.  But Mr. Thompson's testimony is far broader: he plainly stated that "[n]o one at Motorola discriminated against [him]."  *Id.*  Mr. Thompson's *own* testimony therefore provides the most compelling evidence that MSI and Mr. Silverfarb did not engage in racial discrimination.  *Cf. Adams v. Grant-Holloday Nursing Home, Inc.*, No. 80-cv-976, 1982 WL 31015, at *5 (D.D.C. Jan. 25, 1982) ("Plaintiff's own testimony is fatal to this Title VII action.

The plaintiff . . . essentially acknowledged that his firing was not due to sex or national origin discrimination.").

Furthermore, Mr. Thompson has failed to point to anything in the record that raises a genuine dispute of material fact. Even if a jury credits Mr. Thompson's testimony that Mr. Semler was present with him at the Dyson site on the morning of August 1, there is not enough evidence in the record to conclude that MSI and Mr. Silverfarb engaged in racial discrimination. Recall that MSI, the prime contractor, was one degree removed from Mr. Thompson, who was employed by HICAPS. Discovery has revealed that no MSI employee was present at the Dyson site on August 1. Thompson Dep. 150:22–25; MSI Undisputed Facts ¶ 39. Mr. Jones thus learned about the incident from photos and reports. MSI Undisputed Facts ¶¶ 40, 45; WMATA Email. Mr. Jones then called Mr. McGee and asked him to identify "the Motorola [or] HICAPS representative on site." Jones Dep. 17:11–22, 42:1–4. Mr. McGee identified solely Mr. Thompson. *Id.* Upon learning this information, Mr. Jones directed that Mr. Thompson be removed from the WMATA Project. HICAPS Undisputed Facts ¶ 39; Jones Dep. 14:12–18; McGee Dep. 10:21–11:2. Critically, Mr. Thompson has not pointed to any evidence in the record calling into question this sequence of events. Thus, regardless of whether Mr. Thompson's removal was justified, the record shows that Mr. Jones reasonably believed that Mr. Thompson was the responsible employee on site. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." (citation omitted)); *Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light

of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." (citation omitted)).[10]

Finally, Mr. Thompson has failed to demonstrate pretext. He makes much of MSI's inaction toward two white HICAPS employees, Joshua Stone and Hallie Townsend, but these individuals are not viable comparators. MSI Opp'n at 13–14, 21–24. "To prove that he is similarly situated to another employee, a plaintiff 'must demonstrate that [he] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness.'" *Burley*, 801 F.3d at 301 (alteration in original) (citation omitted). Here, Ms. Townsend had a different position at HICAPS (Project Manager), and there is no evidence of any misconduct from her aside from a personality conflict she had with someone at WMATA—far different from Mr. Thompson's misconduct in "endanger[ing] the life and safety of people on [the] job." Jones Dep. 20:10–15. With respect to Mr. Stone, he is like Mr. Thompson in that he was also a Site Supervisor who was involved in an episode of safety misconduct. But the surface similarities end there. Mr. Stone entered a "drop zone" while someone else was working on a tower, which Mr. Jones characterized as "inconsequential and insignificant." *Id.* at 33:1–12, 35:4–7. Indeed, while Mr. Stone's safety misconduct put only himself at risk and "created a stop work order on a per-site basis on the magnitude of an hour or so," *id.* at 33:20–34:4, Mr. Thompson's safety misconduct put others at risk for whose safety he was responsible and triggered a *project-wide* stop work for *three weeks*. *See* WMATA Email; Ex. B to Constantino Decl. at PDF page 386, ECF No. 31-13 (safety shut-down complete email). That is plainly not an "offense[] of

---

[10] The only evidence Mr. Thompson has against Mr. Silverfarb is Mr. Thompson's uncorroborated testimony that Mr. Silverfarb told Mr. Smith, "Let's get rid of Fred." Thompson Dep. at 139:12–19. But that lone statement is consistent with Mr. Jones's action in removing Mr. Thompson from the WMATA Project on the basis of reasonably believed, non-discriminatory reasons.

comparable seriousness." *Burley*, 801 F.3d at 301 (citation omitted).  Mr. Thompson's

"proffered comparator evidence" would not permit "a reasonable factfinder" to conclude that the

reason he was being treated "more harshly" than HICAPS's white employees was his race.  *Id.* at

302.  Thus, the Court grants MSI and Mr. Silverfarb summary judgment on these claims.[11]

### C. MSI and Jake Silverfarb (Tortious Interference)

Mr. Thompson's claim for tortious interference against MSI and Mr. Silverfarb also fails.

"To establish a prima facie case of tortious interference and survive summary judgment, [Mr.

Thompson] must demonstrate: '(1) existence of a valid contractual or other business relationship;

(2) [MSI's] knowledge of the relationship; (3) intentional interference with that relationship by

[MSI]; and (4) resulting damages.'" *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038

(D.C. 2015) (citation omitted).  According to D.C. law, "the 'motive' behind the interference is

the key consideration in determining whether recovery under the tort is available." *Havilah Real*

*Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 346 (D.C. 2015).

Here, the parties agree that there was a valid employment contract between HICAPS and

Mr. Thompson, and also that MSI was aware that Mr. Thompson was HICAPS's employee.

MSI Opp'n at 16.  But Mr. Thompson falters at the third step of this analysis.  "[A] plaintiff can

prove intent by showing that a defendant knew that his actions were certain or substantially

certain to interfere with the plaintiff's business." *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d

196, 203 (D.C. 2017).  Here, there is no evidence in the record showing that MSI intended to

interfere with Mr. Thompson's employment at HICAPS or knew with substantial certainty that

this would occur.  Mr. Jones testified that when he directed HICAPS to remove Mr. Thompson

---

[11] Because the Court grants MSI summary judgment on the race discrimination claims, it
need not reach the question of whether MSI is Mr. Thompson's "employer" for purposes of the
DCHRA.

from the WMATA Project, he had "no input into the decision to terminate Fred Thompson" from HICAPS.  Jones Dep. 14:4–18.  Mr. Jones further testified that he was aware that "HICAPS has contracts . . . all over the United States" and that he did not have "any expectation one way or the other" whether HICAPS would terminate its relationship with Mr. Thompson.  *Id.* at 25:5– 17.  Mr. Thompson argues that this testimony is evidence that Mr. Jones basically knew that Mr. Thompson would be terminated.  Not so: a person is not "certain or substantially certain" of a result if he does not have any expectation about it one way or the other.  *Whitt*, 157 A.3d at 203. Thus, Mr. Thompson cannot satisfy the third element of tortious interference.

Furthermore, even assuming (without granting) that MSI's removal of Mr. Thompson from the WMATA Project intentionally interfered with his employment at HICAPS, MSI was fully justified in its actions.  "[A] defendant may avoid liability if [it] can demonstrate that [its] conduct was 'legally justified or privileged.'"  *Presidential Bank, FSB v. 1733 27th St. SE LLC*, 404 F. Supp. 3d 1, 13 (D.D.C. 2019) (alterations in original) (quoting *Armstrong v. Thompson*, 80 A.3d 177, 190 (D.C. 2013)).  Here, MSI argues that it was legally justified in removing Mr. Thompson from the WMATA Project because its agreement with HICAPS expressly permitted it to do so.  MSI Mot. at 20 (citing MSI Undisputed Facts ¶ 2).[12]  Indeed, section 15(H) of the Master Construction Management Services Agreement between MSI and HICAPS provides that "Motorola reserves the right . . . to stop work of [HICAPS] or its employees or agents at any

---

[12] Mr. Thompson's opposition failed to respond to MSI's legal justification defense.  Def. MSI's Reply in Further Support of its Mot. Summ. J. ("MSI Reply") at 21, ECF No. 38.  *See Hill v. Garland*, No. 19-cv-3389, 2021 WL 965624, at *6 (D.D.C. Mar. 15, 2021) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citation omitted)).  Nevertheless, the Court will consider this argument on the merits to ensure that MSI and Mr. Silverfarb are entitled to summary judgment.  *See Morgan v. Wash. Metro. Area Transit Auth.*, No. 15-cv-0401, 2016 WL 6833926, at *10 (D.D.C. Nov. 18, 2016).

time" for safety violations and that "[HICAPS] agrees that, upon removal of an employee or agent of [HICAPS] from Motorola's premises for violation of this Section, *such employee or agent shall not be reassigned to perform duties at any Motorola facility under this or any other Agreement with Motorola*."  Ex. B to Constantino Decl. at PDF page 361, ECF No. 31-13 (emphasis added).  Mr. Thompson does not dispute that he was involved in the safety violation at the Dyson site, which Mr. Jones cited as the basis for his action.  MSI Undisputed Facts ¶ 36; Jones Dep. 20:10–15.  *See Presidential Bank*, 404 F. Supp. 3d at 14 (granting defendant summary judgment on tortious interference claim where defendant's actions were "legally justified under the agreement's terms").  For all these reasons, summary judgment should be granted to MSI and Mr. Silverfarb as to this claim.

## V.  CONCLUSION

For the foregoing reasons, the Court denies Defendants HICAPS and McGee's motion for summary judgment (ECF No. 30), and grants Defendants MSI and Silverfarb's motion for summary judgment (ECF No. 31).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  September 19, 2022                                     RUDOLPH CONTRERAS
                                                              United States District Judge